QUEEN ET AL. *v.* ANDERSON ET AL.

[No. 22, October Term, 1948.]

524

*Decided December 8, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*B. Conway Taylor, Jr.,* with whom were *W. Hamilton Whiteford* and *Due, Nickerson & Whiteford* on the brief, for the appellants.

*Marvin I. Anderson,* with whom was *C. Osborne Duvall* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree "setting aside" certain "tax sale proceedings" and a deed from the County Commissioners to defendant Richard Queen, and declaring the deed "null and void", but decreeing to be "due and owing", to Richard from his seven brothers and sisters, all plaintiffs except one sister, a defendant, and "to be a lien" on their respective interest in the property in

question, certain sums aggregating $783.42 less credits to three of the brothers, and decreeing payment of the sum due or, in default, sale of the property. Both defendants have appealed. The defendant sister apparently claims no interest in the property and therefore seems to have no interest in the appeal except perhaps because of the pecuniary decree against her and the plaintiff brothers and sisters.

In their brief defendants, "for purposes of this appeal, * * * adopt the statement of facts" in the opinion of the lower court. At the argument they suggested a distinction in this respect between facts and implications in the opinion. We find no basis for such a distinction. The facts stated in the opinion are found from the evidence with the opportunity to see and hear the witnesses. As defendants, in the appendix to their brief, set out no evidence at all, and the testimony set out in plaintiffs' brief is not more favorable to defendants' contentions than the opinion, we must necessarily confine ourselves to the facts stated in the opinion. *Grimm v. Virts*, 189 Md. 297, 55 A. 2d 716.

Judge McWilliams in his opinion states the facts thus:

"On 22 November, 1905, Louis Queen acquired a tract of land in Anne Arundel County containing approximately 48 acres. In 1907 he died, intestate. He was survived by his widow, now Anna Anderson, and the other parties to this cause, who are his children. The widow and the children, with some exceptions, have occupied the land ever since. It appears that taxes were paid infrequently and the property was sold several times for the non-payment of taxes, but was always redeemed by one or more of the children before the period of redemption expired.

"No taxes were paid for the years 1931, 1932, 1933 and 1934. On October 16, 1935, C. Albert Hodges, late County Treasurer, advertised and sold the property for the delinquent taxes above mentioned. There being no bidders, the County Commissioners of Anne Arundel County purchased the property for the sum of $193.64, that being the amount of taxes in arrears plus the cost of making

the sale. The Treasurer did not report the sale to the Circuit Court until 22 November, 1937. The final order of ratification was passed by the Court on 27 January, 1938.

"It is difficult to obtain an accurate picture of what actually happened before and after the tax sale because of the fact that the testimony produced at the hearing is in many instances contradictory, ambiguous and generally unsatisfactory. After reviewing it a number of times, I am of the opinion that the story is about as follows:

"With one or two possible exceptions, all of the parties to this cause are uneducated colored people who know nothing of business and, except for Richard, have spent their entire lives in the country. Since each of them owned only a fractional interest in the property, it is understandable that the responsibility for paying taxes did not weigh too heavily on any of them. As a matter of fact, it is doubtful if any of them had any full realization of the importance of paying taxes. Their joint laxity in this regard may be partially excused by a recognition of the then existing policy of the Treasurer, who was himself shockingly lax in the collection of taxes. That it was necessary to have a special Act of Legislature passed to provide for the collection of taxes four years in arrears seems sufficient evidence of this fact.

"The defendant, Richard Queen, left the home some years ago and became a railroad porter, making his residence in New York. All the others lived on the property, leading a rather simple communal life. Apparently no attempt was made to allot portions of the property for the use of any particular one. Each one seemed to be satisfied with making whatever use of the property happened to suit him, and since their various uses of the property seemed never to be in conflict, they experienced no difficulties. Richard visited the home from time to time, and claims that, on several occasions, he furnished the funds needed to redeem the property from prior tax sales.

"After the sale of the property in October, 1935, to the County Commissioners, some small payments were made to the County Treasurer by one of the parties. There is some evidence tending to show that Richard made these payments, but in his testimony he denied having made them, so it is reasonable to conclude that they were made by one of the others. At least one of the parties, Joseph Queen, was concerned about the fact that the property had been sold to the County for taxes because he was told by the Property Clerk that if the entire arrears were not paid up they would lose not only the property but the money that had been paid as well. At or about this time,—just when it is difficult to determine from the testimony,—Richard came down from New York and interested himself in the matter of the tax arrears. There is some evidence tending to prove that the others paid him some money to apply on the back taxes but just exactly what the circumstances surrounding these payments were it is impossible to determine.

"Some time during the fall of 1937, Richard entered into negotiations with the County Treasurer's office for the purchase of the property. That he intended to purchase the property, rather than redeem it, seems quite clear, and it is equally clear that he did not make known his intention to purchase it to the other co-owners. He borrowed the money from an aunt in New York, and on January 20, 1938, paid the County Treasurer $235.68, representing the balance due on the property and probably including taxes for the years 1936, 1937 and 1938.

"At this point it should be noted that the purchase price required by the Treasurer was paid seven days before the final ratification of the tax sale. The deed from the County Treasurer to Richard Queen was executed and recorded February 1, 1938, five days after the ratification of the tax sale.

"Shortly after the transaction was concluded, Richard informed all but one or two of the other parties that he had bought the property and that from then on his mother was to be the boss. In his testimony he said that he was

going to be the 'controller'. There was little, if any, change in the subsequent use of the property. From time to time Richard spent some money making repairs and improvements, and for the years 1939 to 1945, inclusive, he paid all the taxes. Joseph made some repairs and improvements on a house occupied by him, and Herbert and Harry built a tobacco barn on the property, but they kept all the money that was realized from the sale of the tobacco. What other expenditures the brothers made on the property after 1937 appear to have been made for their own comfort and convenience, rather than for the benefit of all. From time to time Richard tried, with indifferent success, to collect money from the others. It is not clear whether they considered this to be their share of the taxes or rent.

"The incident which resulted in the institution of this litigation occurred in 1945. It was the renting by Herbert of his house to some other person. When Richard found out about this, he demanded that the rent be paid to him as he was the owner of the propery. The brothers thereupon consulted counsel, and this suit was filed in the early part of 1946.

"Considering all the circumstances, I find it difficult to conclude that the plaintiffs fully realized Richard's claim of absolute ownership until they consulted counsel. I doubt very much if Richard ever made it plain to them that it was his intention to become the absolute owner and that from 1938 on they were merely tenants by sufferance. Of course, it is true that he told them he had bought the property, but I am inclined to believe that they all thought he had bought it for the family, and that since it had not fallen into the hands of outsiders everything would continue as before. I must admit, however, that it would be difficult to sustain this belief if the parties were literate, intelligent people, with a substantial knowledge of day to day business details.

"The relief prayed for in the amended bill of complaint is that the deed from C. Albert Hodges, late County Treasurer, and the County Commissioners of Anne Arun-

del County to Richard Queen be set aside, and that the plaintiffs may be declared to hold the property unaffected thereby, or, in the alternative, that Richard Queen may be declared to hold the property in trust for the heirs of Louis Queen and that a Trustee may be appointed to convey the legal title to Louis Queen's heirs. The amended bill also asks for the usual general relief.

"Elizabeth Boston is named as a party defendant, but it seems quite clear that this is only for the purpose of bringing her interest in the property before the Court, because, for some reason or other, she declined to become a plaintiff. She has not answered but, under the view I take of the case, this makes no difference. The defendant, Richard Queen, answered in detail, contending in substance that the suit of the plaintiffs is barred by laches and limitations."

Judge McWilliams then states the question presented:

"The tax sale held in October, 1935, has already been considered by the Court of Appeals in *Free v. Greene,* 175 Md. 36, 199 A. 857, 117 A. L. R. 717. In that case the report of sale was not filed in this Court until February 4, 1937. It was held that the delay was about five months too long and for that reason the Court reversed the decree of the Chancellor, thereby making the sale void. In the instant case, the report of sale was not filed until November 22, 1937, almost ten months later than the filing of the report in *Free v. Greene, supra.* It hardly seems necessary to say that if the delay in *Free v. Greene, supra,* was fatal, then the delay in this case must be all the more fatal.

"There is no doubt whatever that if the plaintiffs had brought suit to set aside this tax sale in 1939 or 1940, the Court, following the case of *Free v. Greene, supra,* would have been obliged to declare it null and void. The question presented here is, has anything occurred between 1938 and the date of the filing of this bill which operates to validate an admittedly invalid tax sale. The defendant contends that his title is now not subject to attack because of laches on the part of the plaintiffs and the running

of the period of limitations prescribed by Chapter 208 of the Acts of 1941.

"Chapter 208 of the Acts of 1941 added a new section to the tax sale laws of Anne Arundel County. It provides in part as follows:

'496C. (a) When a sale of property for taxes has been ratified by order of court, no suit or action may be brought to contest the title of the purchaser of such property on the ground of any invalidity or irregularity in the proceedings in connection with such sale—

'(1) After three years from June 1, 1941, if the sale was ratified before that date, except as provided in (3); * * *

'After the expiration of such periods the order of court ratifying the sale shall be conclusive as to the legality of all proceedings in connection with the sale of the property.'

"If the above statute is valid and within the constitutional power of the Legislature to enact, then the plaintiffs are effectively barred from maintaining this suit. However, there is grave doubt as to the validity of these statutes."

On the question of laches he says: "Referring to the defense of laches, it is true that there has been a long delay but as I have said before, the delay is understandable, and it appears that the plaintiffs acted promptly when they came to a full realization of the nature of the defendant's claim of title. Furthermore, it requires nothing more than the payment of money to put the defendant in *status quo ante*." In this view we concur. It may be added that the bill alleges and the court in effect finds that plaintiffs are and always have been in possession of the property; Richard's alleged title under the Act of 1941 did not exist until June 1, 1944. The bill is in the nature of a bill to quiet title, not an action of ejectment.

Judge McWilliams holds that section 496C (a) (1) of the Act of 1941 "does not operate to bar the plaintiffs from maintaining this suit". We concur in this conclusion. We may assume, without deciding, that: a

statute of limitations might reduce, in all cases or in cases against purchasers at tax sales, the necessary period of adverse possession from twenty years to three and the Act of 1941, if so limited or construed and applied, would be valid. *Cf. Kelch v. Keehn,* 183 Md. 140, 36 A. 2d 544. But, as has been said, plaintiffs are in possession and cannot be barred by a statute of limitations. Even if the Act of 1941 could bar a bill to quiet title, it would not purport to destroy a defense of title and possession in an action of ejectment or other proceedings at law or in equity.

As this court has often said, report and ratification of a tax sale was not required until 1867, and after 1872 (until 1943) ratification merely shifted the burden of proof of invalidity of the sale and was *prima facie,* not conclusive, evidence of a good title. *Gill v. Sommer,* 191 Md. 204, 209-210, 60 A. 2d 683, 685. In the case of *Free v. Greene, supra,* it was held that under the Anne Arundel County statute, Code of Public Local Laws (1930), as amended by Act of 1931, ch. 280 (not necessarily under other statutes) a tax sale is invalid unless reported and ratified within eleven months. In *Baumgardner v. Fowler,* 82 Md. 631, 34 A. 537, it was held that a Garrett County statutory provision that ratification of a tax sale would be conclusive as to the regularity of the Treasurer's proceedings and of the sale, except in case of fraud, was invalid. Quoting *Marx v. Hanthorn,* 148 U. S. 172, 13 S. Ct. 508, 37 L. Ed. 410, this court said: "It is competent for the legislature to declare that a tax deed shall be *prima facie* evidence, not only of the regularity of the sale, but of all prior proceedings and of title in the purchaser, but the legislature cannot deprive one of his property by making his adversary's claim to it, whatever that claim may be, conclusive of its own validity, and it cannot, therefore, make the tax deed conclusive evidence of the holder's title to the land." 82 Md. at page 639, 34 A. at page 538. Ratification of a tax sale usually is practically an *ex parte* proceeding. The present general act of 1943, Code Supp. 1947, art. 81, §§ 71A-90W, and the

previous Baltimore City act of 1941, Laws 1941, c. 540, provide a normal procedure for conclusively divesting title in the owner and vesting it in the purchaser at a tax sale, *viz.*, a full-fledged judicial foreclosure proceeding. *Gathwright v. Baltimore*, 181 Md. 362, 370, 30 A. 2d 252, 145 A. L. R. 590; *Shapiro v. National Color Printing Co.*, 191 Md. 194, 60 A. 2d 679. A statute cannot effectually declare that title to property now vested in A shall be vested in B. *Davidson v. New Orleans*, 96 U. S. 97, 102, 24 L. Ed. 616. Ratification of the tax sale in the instant case, which shows on its face that it occurred two years after the sale, cannot be conclusive evidence that the sale was ratified within eleven months.

What rights, if any, some of the plaintiffs may have against their brothers and sisters in respect of improvements made by them is a question which is not raised in the instant case and on which no opinion is intimated. In view of the fact that one sister declined to become a plaintiff and Judge McWilliams apparently did not find all the plaintiffs equally lacking in intelligence, education and experience, we have not considered the alternative ground of relief prayed, *viz.*, that by reason of the tenancy in common and of actual fiduciary family relations Richard should, in equity, be regarded as a trustee buying for the benefit of all the co-tenants and the latter are not by laches barred from such relief.

*Decree affirmed, with costs.*